IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 98-10685

_____

JANICE LYNN KENNEDY,

Plaintiff-Appellant,

versus

TEXAS UTILITIES, a Texas company;
CITY OF GRAND PRAIRIE, TEXAS, and
UNITED STATES OF AMERICA,

Defendants-Appellees.

_____

Appeal from the United States District Court for
the Northern District of Texas

_____

June 21, 1999

Before REAVLEY, JOLLY and EMILIO M. GARZA, Circuit Judges.

REAVLEY, Circuit Judge:

In this personal injury suit, the district court granted summary judgment in favor of the United States, finding it immune from suit under the immunity provision of the Flood Control Act of 1928,[1] and remanded the remaining state law claims to state court. We reverse.

BACKGROUND

Plaintiff Janice Kennedy was injured at Lynn Creek Park when

_____

[1]  33 U.S.C. § 702c.

she stepped on a live electrical cable on or about August 28, 1993. The park is within the city limits of defendant City of Grand Prairie, Texas (City). The land on which the park is located was purchased by the United States "for navigation, flood control and other purposes" under the River and Harbor Act of 1965,[2] for the construction of Joe Pool Lake, also known as Lakeview Lake (the lake). The statute specified that Lakeview project would comply with the recommendations of a March 14, 1963 letter prepared by the Board of Engineers for Rivers and Harbors of the U.S. Army Corps of Engineers (Corps).[3] The letter describes the Lakeview project as a "multiple-purpose" reservoir, and describes those purposes as including flood control, water storage, and recreation.

Hence, the Corps envisioned recreational development from the outset of the Lakeview project. A 1976 contract between the United States and defendant Trinity River Authority (TRA) for recreational development of the lake recites that the United States "agrees to design, construct, and operate the Project to provide for optimum enhancement of general recreation consistent with the other authorized Project purposes." Under this contract the United States and the TRA, an agency of the State of Texas, would share

---

[2] Pub. L. No. 89-298, § 301, 79 Stat. 1074, 1093-97 (1965); see also id. § 315, 79 Stat. at 1101 (specifying that Title III of the Act (§§ 301-315) may be cited as "River and Harbor Act of 1965").

[3] See 79 Stat. at 1095 (funding for Trinity River and tributaries).

the costs of recreational development, and the United States agreed to lease the property comprising the Lakeview project to the TRA. The contract provides that the TRA "shall be responsible for operation, maintenance, and replacement, without cost to the [United States], of all facilities developed to support Project recreation opportunities." A separate lease agreement between the United States and the TRA provides that the TRA as lessee "agrees to administer the land and water areas included in the lease for recreation purposes and to bear the costs of operation, maintenance, and replacement of all facilities and improvements on the premises at the commencement of this lease or added during its term."

The United States also entered into a contract with the TRA for water storage space. Under this contract, the TRA was granted an undivided 100 percent interest of the total storage space of the lake below an elevation of 522 feet. The TRA agreed to repay the United States an amount representing that portion of the total project cost allocated to the water storage right acquired by the TRA.

In addition to the statutory mandate to construct the lake for flood control, the record shows that the lake was built and its water level regulated for flood control purposes, in conjunction with other flood control facilities in the Trinity River basin. The Corps monitors the water level in the lake daily as part of its flood control operations. The lake is designed and operated to

3

store water for conservation and water supply up to an elevation of 522 feet.  The Corps refers to the lake as a conservation storage pool up to this elevation.  On the date of Kennedy's injury the lake elevation was about 521 feet.  The lake is also designed to store water up to an elevation of 536 feet for flood control purposes during periods of above average inflows, and frequently stores water at an elevation above 522 feet.  The Corps designates the lake as a flood storage pool at elevations between 522 and 536 feet.  The United States offered evidence that the Corps originally purchased land up to an elevation of 541 feet for flood control purposes. The United States thus showed that the flood control function of the project determined the boundaries of the property it purchased for the Lakeview project.  It also showed that the highest recorded elevation of the lake is 533 feet, and that the electrical line which injured Kennedy is sometimes submerged by the lake.  Hence, the evidence indicates that Kennedy was injured on land purchased by the United States for flood control, water storage, and recreational purposes, under lease to the TRA for recreational purposes, and which is sometimes covered with flood waters.

The injury occurred on a sandy beach area near the lake. Kennedy had entered the park as a paid visitor.  In interrogatory answers she attested that she visited the park "for the purpose of recreational swimming with friends," and she later testified in her deposition that "we went out there just to, you know, try to get a

4

tan and hang out at the lake." She stepped on the electrical line after either going for a swim, or wading and submerging herself in the water. Kennedy offered evidence that the line was part of an electrical system at the park that had been installed after discussions among the City, defendant Texas Utilities Electric Co. (Texas Utilities), and the TRA, regarding the need for a power source at the park for recreational purposes such as concerts. The evidence is undisputed that the line was not installed by the United States, and was not used in connection with flood control. The line was placed in the park after the park property was leased to the TRA.

Kennedy brought suit in state court against the City, the TRA, and Texas Utilities, asserting state law negligence claims. She amended her state court petition to add a claim against the United States under the Federal Tort Claims Act (FTCA).[4] The United States removed the case to federal court.[5] In her last amended complaint, Kennedy alleged several theories of premises and

---

[4]  28 U.S.C. § 2671-80.

[5]  The suit was removable because a federal cause of action was asserted, *see* 28 U.S.C. § 1441(a), and because the United States was a defendant, *see* 28 U.S.C. § 1346(b)(1). Although Kennedy originally asserted her federal claim against the Corps, the United States is the proper and exclusive defendant to this claim, and Kennedy does not argue otherwise. *See* 18 U.S.C. § 2679; *Atorie Air, Inc. v. FAA*, 942 F.2d 954, 957 (5th Cir. 1991) ("All suits brought under the FTCA must be brought against the United States."). We note that Kennedy also filed a separate federal suit against the Corps, and that this suit was consolidated with the removed state court action.

5

negligence liability against the United States.[6]  The United States filed a motion to dismiss or in the alternative for summary judgment, asserting immunity from suit under the Flood Control Act and other grounds for summary judgment.  The district court granted summary judgment for the United States on grounds of immunity.  Thereafter, the City of Grand Prairie filed a motion to remand the remaining state law claims to state court.  The district court granted this motion.

## DISCUSSION

A.  *The Flood Control Act*

Kennedy contends that the district court erred in ruling that the United States is immune from suit under the Flood Control Act.  We agree for the reason that the summary judgment evidence established as a matter of law that the United States is not immune.

"[T]he starting point for interpreting a statute is the

---

[6]  Kennedy alleged that the United States "as the owner and landlord of the premises, retained control of the premises to such an extent that it owes the duty to Plaintiff owed by a private owner of land to an invitee," and that the United States "breached this duty and this breach proximately caused injuries to Plaintiff;" alternatively, that the United States "engaged in inspections of the premises . . . and exercised dominion and control over the property by requiring repairs and alteration," and was therefore liable to Kennedy "for her injuries proximately caused by 'USA's' negligent performance of its undertaking to inspect the premises;" and alternatively that the United States "negligently created the dangerous condition that proximately caused Plaintiff's injuries by limiting 'TRA's' ability to safely install or approve the proper installation of electricity along or near the shoreline."

language of the statute itself."[7]  We have explained that "we follow the plain meaning of a statute unless it would lead to a result so bizarre that Congress could not have intended it."[8] Absent congressional direction to the contrary, words in statutes are to be construed according to "their ordinary, contemporary, common meaning[s]."[9]

The immunity provision of the Flood Control Act (hereinafter Act), 33 U.S.C. § 702c, states:  "No liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place."  The plain wording of the statute is confined to damages sustained "from or by floods or flood waters at any place."  Kennedy was injured on dry land adjacent to a lake constructed for flood control and other purposes.  While the term "flood waters" may be ambiguous and thus subject to differing interpretations, the ordinary and common meaning of an injury or damages sustained "from or by floods or flood waters" does not, in our view, extend to an injury occurring on land apart from water and as the result of a use of the land itself.

---

[7]  *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980)

[8]  *Johnson v. Sawyer*, 120 F.3d 1307, 1319 (5th Cir. 1997) (internal quotations omitted).

[9]  *Pioneer Inv. Servs. Co.  v. Brunswick Assocs. Ltd. Partnership*, 507 U.S. 380, 388 (1993) (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)).

7

The parties properly focus much of their argument on two cases, the Supreme Court's decision in *United States v. James*,[10] and our decision in *Boudreau v. United States*.[11]  We cannot agree with Kennedy that § 702c immunity is limited to federal water projects devoted exclusively to flood control, in contrast to a multi-purpose project such as Joe Pool lake.  In *James*, the Court found that § 702c immunity applied even though one of the reservoir projects in issue was "used for fishing, swimming, boating, and waterskiing," and the government promoted recreational use.[12]  In *Boudreau*, we noted that federal law authorizes the Corps to "construct, maintain, and operate public park and recreational facilities" at flood control projects.[13]  In both cases the injuries were sustained by persons who were on the water for recreational purposes.  We agree with the Ninth Circuit that § 702c immunity is not rendered inapplicable "by the multi-purpose nature of the flood control facility . . . .  It is clear the immunity provision . . . can apply even though a federal project has multiple purposes and is not intended exclusively for flood control.  *James* itself involved injury to recreational users of a reservoir that also had

---

[10] 478 U.S. 597 (1986).

[11] 53 F.3d 81 (5th Cir. 1995).

[12] 478 U.S. at 599.

[13] 53 F.3d at 85 n.13 (quoting 16 U.S.C. § 460d).

federal flood control use."[14]

Nevertheless, neither *James* nor *Boudreau*, in our view, supports governmental immunity on these facts. In *James*, the Court ruled that the immunity provision covered two cases "where recreational users of reservoirs were swept through retaining structures when those structures were opened to release waters in order to control flooding."[15] The reservoirs were federal flood control projects, and the accidents occurred when the Corps released water from the reservoirs. The accident victims drowned or were injured when they were pulled through drainage structures. At the time the reservoirs were at flood stage, and the release of the waters was carried out by the Corps in the course of flood control operations.[16] Finding it "difficult to imagine broader language" than that found in § 702c, the Court held that the language of the statute on its face covered the accidents in issue.[17] The Court found it "clear from § 702c's plain language

---

[14] *McCarthy v. United States*, 850 F.2d 558, 562 (9th Cir. 1988). *See also Reese v. South Florida Water Management Dist.*, 59 F.3d 1128, 1130 (11th Cir. 1995) (holding that § 702c immunity applies to Lake Okeechobee, a "multi-purpose federal flood control project"); *Zavadil v. United States*, 908 F.2d 334, 335-36 (8th Cir. 1990) (holding that § 702c applied because one of the purposes of the federal water project in issue was flood control and navigation).

[15] 478 U.S. at 599.

[16] *Id*. at 599-600.

[17] *Id*. at 604.

that the terms 'flood' and 'flood waters' apply to all waters contained in or carried through a federal flood control project for purposes of or related to flood control, as well as to waters that such projects cannot control."[18] It found congressional intent to extend immunity "to protect the Government from "'any' liability associated with flood control."[19] In response to plaintiffs' argument that the injuries were the result of "alleged mismanagement of recreational activities wholly unrelated to flood control," the Court concluded that "the manner in which to convey warnings, including the negligent failure to do so, is part of the 'management' of a flood control project," and further that "the release of the waters . . . was clearly related to flood control."[20]

*James*, of course, rests on facts very different from those presented in the pending case. The injured parties in *James* were in the water, and suffered injuries when the Corps released flood waters as part of its flood control function. In our view, nothing in the language or reasoning of *James* compels us to hold that the injury here, which occurred on dry land and was due to a condition unrelated to flood control, is nevertheless an injury "from or by floods or flood waters." In *James*, the Court held that the terms

[18] *Id*. at 605.

[19] *Id*. at 608.

[20] *Id*. at 610.

10

"flood" and "flood waters" "apply to all *waters* contained in or carried through a federal flood control project *for purposes of or related to flood control.*"[21] By this reasoning all the waters in Joe Pool Lake might well constitute "flood waters," whether or not the lake is at flood stage. It does not follow that Kennedy's injuries were "from or by" such flood waters. Her injuries were caused by an electrical cable which was not installed or maintained by the United States, and which served no flood control purpose whatsoever. The alleged liability is not, in our view, "associated with flood control." or "clearly related to flood control."[22]

We likewise think that our *Boudreau* decision is factually distinguishable. In that case, the plaintiff was boating on a federal flood control reservoir. He requested assistance from the Coast Guard Auxiliary after experiencing engine trouble. He claimed that he was injured due to instructions from the Coast Guard Auxiliary to lift anchor.[23] Quoting language from *James* that the immunity provision protects the government from "'any' liability associated with flood control," and that "the terms 'flood' and 'flood waters' apply to all waters contained in or carried through a federal flood control project for purposes of or

---

[21] *Id*. at 605 (emphasis added).

[22] *Id*. at 608, 610.

[23] 53 F.3d at 82.

11

related to flood control,"[24] we held that "there is a sufficient association between the Coast Guard Auxiliary's activities and flood control"[25] for the immunity provision to apply. Specifically, we noted that "the creation of the flood control project resulted in the [Corps] being responsible for providing water safety patrols at the lake," a responsibility contractually assigned to the Coast Guard Auxiliary; that the injury was related to "the management of flood waters" because "the injury resulted from a boating accident on flood control waters involving the Government's patrol of those waters;" and that "a boating accident such as this could only occur on water."[26] This reasoning, and the underlying facts, distinguish the pending case from *Boudreau*. In the pending case, there is no corresponding association with flood control. In *Boudreau*, the alleged negligent conduct of the government, and the accident itself, occurred on flood control waters. The electrical cable that injured Kennedy had no association with flood control, and the federal government's alleged malfeasance or nonfeasance bore no relation to flood control.

In this case, the only relation to "flood waters" is that Kennedy would not have gone to the park but for the existence of the lake, and that her injury occurred on a patch of land that is

---

[24] *Id*. at 83 & n.5 (quoting *James*, 478 U.S. at 605, 608)).

[25] *Id*. at 84.

[26] *Id*. at 85–86 & n.15.

12

within the flood stage pool. This alleged nexus with flood waters is, in our view, too attenuated to hold that Kennedy suffered "damage from or by" such waters under § 702c.

The United States has cited no authority, nor can we locate any, for the proposition that an injury occurring on dry land, as a result of a condition on such land that is wholly unrelated to flood control, falls within the ambit of § 702c. There is authority to the contrary. In *Fryman v. United States*,[27] discussed in *Boudreau*,[28] the Seventh Circuit held that the government was immune from suit by a plaintiff who was injured when he dived into a lake created for flood control purposes. In dicta, the court rejected the notion that immunity should extend to the circumstances present in our case – an injury on dry land and unrelated to the management of flood waters:

> *James* was so broadly written that it cannot be applied literally. The "management of a flood control project" includes building roads to reach the beaches and hiring staff to run the project. If the Corps of Engineers should allow a walrus-sized pothole to swallow tourists' cars on the way to the beach, or if a tree-trimmer's car should careen through some picnickers, these injuries would be "associated with" flood control. They would occur within the boundaries of the project, and but for the effort to curtail flooding the injuries would not have happened. Yet they would have nothing to do with management of flood waters, and it is hard to conceive that they are "damage from or by floods or flood waters"

---

[27] 901 F.2d 79 (7th Cir. 1990).

[28] 53 F.3d at 83-85 & nn. 6,8.

13

within the scope of § 702c.[29]

In *Cox v. United States*,[30] the plaintiff was injured when she fell from a rope swing, hitting her head on dry land. The swing was located in a recreational area maintained by the Corps, adjacent to a reservoir created for flood control purposes. The plaintiff had gone to the lake to swim.[31] The court concluded that § 702c immunity was not available to the government, essentially agreeing with the analysis from *Fryman* quoted above:

> It is interesting to note that the *Fryman* court chose to illustrate situations where immunity would not apply to citing hypothetical scenarios wherein accidents occurred on land near, but not in, the water of a flood control project. This Court believes that *Fryman* properly defines the outer limits of Section 702c immunity.[32]

Finally, we note that unambiguously extending immunity to the facts presented here, either at the time of passage of the Act or in later years, would have been a fairly simple exercise of legislative drafting. Congress could have extended immunity to all injuries occurring on property purchased for flood control purposes, regardless of the relation of the injury to flood control activities, and regardless of whether the injury occurred in the water. Having chosen instead to limit immunity to "damage from or

---

[29] *Id*. at 81.

[30] 827 F. Supp. 378 (N.D. W. Va. 1992).

[31] *Id*. at 379-80.

[32] *Id*. at 381.

14

by floods or flood waters at any place," we are persuaded that the Act's immunity provision does not extend to this case.

B.  *Remand of State Law Claims*

After dismissing the federal claim against the United States, the district court granted the City's  motion to remand the remaining state law claims to state court.  Kennedy complains that the district court erred in granting this motion.

The district court remanded the case under 28 U.S.C. § 1367(c).  This statute provides that a district court may decline to exercise supplemental jurisdiction over a state law claim if "the claim raises a novel or complex issue of State law," or "the district court has dismissed all claims over which it has original jurisdiction.[33]  The district court remanded for both reasons, explaining:

> The Court, having dismissed all claims against the United States of America over which the Court possessed original jurisdiction, is of the opinion that remand of the remaining pendent [claims] is both authorized and proper. The court dismissed all claims over which it had original jurisdiction and the remaining claims are claims which existed in the Plaintiff's original complaint in state court.  The Court determines that the state interests in litigating the claims, which raise a novel or complex issue of state law, compel the Court to remand the remaining claims to be determined in state court.

We are doubtful that the court would have remanded the remaining state law claims but for its summary judgment dismissing the federal claim against the United States, since a partial remand

---

[33] 28 U.S.C. § 1367(c)(1) & (c)(3).

15

of state claims while the federal claim was still viable would have necessitated prosecution of Kennedy's claims in two courts, in a case where issues of allocation of fault, contribution and/or indemnity among the defendants appear to favor a resolution of the claims in a single proceeding.  Further, the suit was remanded after over two years of litigation in federal court, which included extensive discovery and the filing of numerous dispositive motions.

We may review discretionary remands under § 1367.[34]  Review is for abuse of discretion.[35]  "A district court abuses its discretion if it bases its decision on an erroneous view of the law or on a clearly erroneous assessment of the evidence."[36]  "A district court by definition abuses its discretion when it makes an error of law."[37]  Because we have held that the district court erroneously granted summary judgment for the United States, and because its decision to remand the state law claims was based at least in part on this summary judgment, we conclude that the court erred in remanding the state law claims.

CONCLUSION

---

[34] *Doddy v. Oxy USA, Inc.*, 101 F.3d 448, 455 n.3 (5th Cir. 1996); *Thomas v. LTV Corp.*, 39 F.3d 611, 615-16 (5th Cir. 1994).

[35] *Doddy*, 101 F.3d at 455.

[36] *Esmark Apparel, Inc. v. James*, 10 F.3d 1156, 1163 (5th Cir. 1994).

[37] *Koon v. United States*, 518 U.S. 81, 100 (1996).

16

For the foregoing reasons, the summary judgment in favor of the United States and the order remanding the remaining state law claims are reversed, and we remand this cause to the district court for further proceedings.

REVERSED and REMANDED.