Graciela **ELISERIO**, et al., Plaintiffs,

v.

**FLOYDADA HOUSING AUTHORITY,**
et al., Defendants.

No. CIV.A. L–05–CV–04.

United States District Court,
S.D. Texas,
Laredo Division.

Sept. 26, 2006.

Linley Rebecca Boone, Lakshmi Ramakrishnan, Texas Rio Grande Legal Aid Inc., Weslaco, TX, Robert W. Doggett, Texas Rio Grande Legal Aid Inc., Austin, TX, for Plaintiffs.

Charlotte Bingham, Crenshaw Dupree et al, Lubbock, TX, Jean–Michel Voltaire, U.S. Department of Justice, Washington, DC, for Defendants.

## ORDER

KAZEN, District Judge.

Pending before the Court is the Report and Recommendation of Magistrate Judge Saldaña regarding Defendant Floydada Housing Authority's Rule 12(b)(6) motion to dismiss all the Plaintiffs' claims against it. The Report was filed on September 8, 2006, and neither party has objected to it.

Having carefully considered the Magistrate Judge's Report and Recommendation, the Court concludes that it is well-reasoned and correct.

Accordingly, the Report and Recommendation is ADOPTED, and Floydada's Motion to Dismiss (Docket No. 45) is hereby DENIED.

## REPORT AND RECOMMENDATION

SALDANA, United States Magistrate Judge.

Pending before the Court is Defendant Floydada Housing Authority's Rule 12(b)(6) motion to dismiss all the Plaintiffs' (the individual Plaintiffs and Plaintiff United Farmworkers of America) claims under the Migrant and Seasonal Agricultural Worker Protection Act, 29 U.S.C. §§ 1801–1872, and Plaintiff United Farmworkers of America's claims under the Fair Housing Act, 42 U.S.C. §§ 3601–3631, for failure to state a claim. (Docket No. 45.)

Having reviewed the motion, the parties' filings, and the applicable law, this Court is of the opinion that all the Plaintiffs have stated a claim under the Migrant and Seasonal Agricultural Worker Protection Act and that Plaintiff United Farmworkers of America has stated a claim under the Fair Housing Act. Therefore, Defendant's motion to dismiss should be DENIED.

## FACTUAL BACKGROUND

The individual Plaintiffs, Graciala Eliserio, Jose J. Eliserio, Argelio Garza, Armandina Garza, Marco Gonzalez, Jose Islas, Sonia Islas, Antonio Lopez, Eduvijes Lopez, Armando Soto, Domingo Soto, Maria Soto, Rafael Soto, Jesus Villarreal, Roxana Villarreal, and Juan Gonzalez, are migrant farm workers whose permanent place of residence is in a Texas county on the Texas–Mexico border. (Docket No. 43 ¶ 3.1, Pls.' 2d Am. Compl.) Plaintiff United Farmworkers of America (UFW) is a nonprofit membership organization composed of farm workers who regularly rely on farm labor housing programs for housing in Texas. *Id.* at ¶ 3.2. According to the Texas Director of the UFW, the "UFW's mission is to help farm workers seek improved working conditions, including housing." (Docket No. 50, Flores Aff. ¶ 3.) As such, the UFW has devoted resources and time trying to correct the deficiencies of farm labor housing in Texas on behalf of its members, and this burden has prevented UFW from addressing other priorities, including seeking to improve poor wages as well as access to workers compensation and health care. *Id.* The UFW claims that its "inability to improve housing conditions for farm workers in [the Texas Panhandle area, which includes the City of Floydada] has affected the organization's ability to make an impact for [its] members, and [has] harmed the UFW as an organization." *Id.* at ¶ 4.

All Plaintiffs allege that Floydada Housing Authority (Authority) operates one of the worst farm labor housing facilities in Texas. (Docket No. 43 ¶ 1.6.) According to Plaintiffs' Second Amended Complaint, the United States Department of Agriculture (USDA) is the executive agency of the United States government that Congress charged with administering farm labor housing programs pursuant to Title 42

U.S.C. § 1471, *et seq. Id.* at ¶ 4.1. Plaintiffs claim that the Authority received funding and entered into agreements with the USDA to provide decent and affordable housing to farm workers pursuant to Title 42 U.S.C. §§ 1484 and 1486, also known as the Section 514 and 516 housing programs. *Id.* at ¶ 4.2. As a result, the Authority built a 78–unit farm labor housing facility in Floydada, Texas under the Section 514 and 516 housing programs. *Id.* at ¶ 4.3. In order to save resources, Plaintiffs claim, the Authority has only attempted to maintain approximately half of the 78–unit complex for occupancy during Floydada's farm labor season. *Id.* at ¶ 4.11. The individual Plaintiffs and members of Plaintiff UFW have occupied the Authority's farm labor housing over the years from about June until October, during the pumpkin harvest and cotton gin production, and intend to rent these units in future seasons. *Id.* at ¶¶ 3.2, 4.5, 4.6.

Plaintiffs allege that the Authority's farm labor housing consistently fails to meet federal and state safety and health standards, and has consistently failed to meet these standards for many years. *Id.* at ¶ 4.12. In addition, Plaintiffs claim that the deficient housing conditions materially affect the health and safety of the occupants. *Id.* at ¶ 4.13. As such, Plaintiffs allege that the Authority has violated the Migrant and Seasonal Agricultural Worker Protection Act's (AWPA) safety and health of housing provision, which provides, in relevant part:

> [E]ach person who owns or controls a facility or real property which is used as housing for migrant agricultural workers shall be responsible for ensuring that the facility or real property complies with substantive Federal and State

safety and health standards applicable to that housing.

29 U.S.C. § 1823(a); (Docket No. 43 ¶¶ 5.1, 5.2.)

For this violation, all Plaintiffs filed suit under AWPA's private cause-of-action provision. *See* 29 U.S.C. § 1854. The individual Plaintiffs request actual damages, or alternatively, statutory damages, pursuant to 29 U.S.C. § 1854; and declaratory and injunctive relief from the Authority.[1] (Docket No. 43 at ¶ 5.2.) Plaintiff UFW seeks declaratory and injunctive relief from the Authority. *Id.* at ¶ 7.1(c).

Plaintiffs also allege that the Defendants (the Authority and the USDA) harmed them by the Defendants' discriminatory conduct, based on race and national origin, with respect to: (1) the availability of housing; (2) the terms, conditions, and privileges associated with the rental of a dwelling; and (3) the provision of services and facilities in connection with the rental of a dwelling, all in violation of Sections 3604(a) and 3604(b) of the Fair Housing Act (FHA). *Id.* at ¶¶ 3.4, 5.7, 5.8, 5.9. The individual Plaintiffs request actual damages, punitive damages, declaratory and injunctive relief from the Authority. *Id.* at ¶ 5.13. The UFW seeks declaratory and injunctive relief against the Authority for its violation of the FHA. *Id.* at ¶¶ 5.7, 7.1(c).

## SUMMARY OF ARGUMENT

Defendant Floydada Housing Authority argues that there are two reasons why they cannot be held liable under AWPA's housing provision. First, in order to be liable under this provision, the housing provider must be considered a "person" as that term is defined under the Act. *See* 29

---

1. The individual Plaintiffs also filed claims under Texas state law for violations of their lease and the Texas Habitability Statute. Those claims are not addressed in this report and recommendation.

U.S.C. § 1823(a). AWPA defines "person" as, among other things, "any ... corporation." 29 U.S.C. § 1802(9). Although the Authority concedes that they are a public corporation, they argue that they cannot be considered a "person" under AWPA because of their governmental status. (Docket No. 57 ¶¶ 2, 4, Def.'s Reply.) Specifically, the Authority argues that "statutory language and court decisions regularly distinguish government entities that are public corporations from corporations and that nothing in the AWPA indicates that this distinction should be ignored." *Id.* at 1. Second, the Authority contends that, even if they are considered a "person" for purposes of AWPA's housing provision, an employment relationship between them and Plaintiff migrant workers is required before the Authority is subject to liability under this provision. (Docket Nos. 45 at 6–10, 57 at 10.) The Authority contends that no such relationship exists between them. *Id.*

Plaintiffs maintain that the Court's inquiry with respect to the Authority's liability under AWPA should and with the plain meaning of the statutory text. (Docket No. 59 at 1–2, Pls.' Sur–Reply.) Under AWPA, Plaintiffs note, " 'person' means any ... corporation." *Id.; See* 29 U.S.C. § 1802(9). Plaintiffs argue that "any ... corporation" encompasses all corporate entities on its face. (Docket No. 50 at 2, Pls.' Resp.) Since the Authority is a corporation under Texas state law, Plaintiffs note, the Court therefore should find that the Authority is a "person" under AWPA. *Id.*

Additionally, the Authority argues that Plaintiff UFW lacks standing—specifically prudential or statutory standing—to sue under either AWPA or the FHA in this case. (Docket No. 45 at 11.) In response, the UFW asserts that it has standing to bring this suit under the jurisdiction of federal court pursuant to Article III of the United States Constitution. (Docket No. 50 at 6–17.)

## DISCUSSION

### 1. *Fed.R.Civ.P. 12(b)(6)—Standard for Failure to State a Claim*

When a party files a motion to dismiss a claim under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted, the Court may not dismiss the claim unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Scanlan v. Texas A & M Univ.,* 343 F.3d 533, 536 (5th Cir.2003). In considering the 12(b)(6) motion, the Court may "not go outside the pleadings and must accept all well-pleaded facts as true, viewing those facts most favorably to the plaintiff." *Id.*

### 2. *Statutory Interpretation of "Person" Under AWPA*

In interpreting a statute, the Court's objective is to give effect to the intent of Congress. *Stiles v. GTE Southwest,* 128 F.3d 904, 907 (5th Cir.1997). To give such effect, "[c]ourts routinely emphasize the significance of the precise wording of laws presented for interpretation." *Veeck v. S. Bldg. Code Cong. Int'l,* 293 F.3d 791, 801 (5th Cir.2002). Accordingly, "[t]he starting point for interpreting a statute is the language of the statute itself." *Kennedy v. Texas Utils.,* 179 F.3d 258, 261 (5th Cir.1999) (citing *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980)).

In construing such language, the Court adheres to the "plain meaning of a statute unless it would lead to a result so bizarre that Congress could not have intended it." *Id.* However, "the meaning of statutory language, plain or not, depends

on context." *Chair King v. Houston Cellular Corp.*, 131 F.3d 507, 511 (5th Cir. 1997) (citing *King v. St. Vincent's Hospital*, 502 U.S. 215, 221, 112 S.Ct. 570, 116 L.Ed.2d 578 (1991)). Accordingly, the statute must be read as a whole. *Id.*

■ However, if, after application of the above principles of statutory construction, the Court concludes that the statute is ambiguous, meaning that it is "susceptible to more than one reasonable interpretation [or] more than one accepted meaning," *United States v. Kay*, 359 F.3d 738, 743 (5th Cir.2004), "we may look to the legislative history or agency interpretations for guidance," *United States v. Orellana*, 405 F.3d 360, 365 (5th Cir.2005). *See also Burlington Northern R.R. v. Oklahoma Tax Commn.*, 481 U.S. 454, 461, 107 S.Ct. 1855, 95 L.Ed.2d 404 (1987) ("Legislative history can be a legitimate guide to a statutory purpose obscured by ambiguity").

Under AWPA, " 'person' means any individual, partnership, association, joint stock company, trust, cooperative, or corporation." 29 U.S.C. § 1802(9) (emphasis added). The Authority concedes that, as a housing authority under Texas law, it is a public corporation. (Docket No. 57 at 2, citing Tex. Loc. Gov't Code § 392.002(1), " 'Authority' or 'housing authority' means a public corporation created under this chapter"; Tex. Loc. Gov't Code § 392.011(b), "A municipal housing authority is a public body corporate and politic.")

Giving the phrase "any corporation" its plain meaning, as Congress expressly intended,[2] this phrase clearly encompasses all types of corporate entities, including public corporations. *See, e.g., Cook County, Ill. v. U.S. ex rel. Chandler*, 538 U.S.

119, 124–26, 134, 123 S.Ct. 1239, 155 L.Ed.2d 247 (2003) (rejecting the defendant county's argument that as a local government entity, it was not a "person" under the False Claims Act, and holding that even the undefined statutory term "person" included corporations, both public and private). In fact, the Supreme Court recognized that there is an "understanding going back at least to Coke [referring to the year 1787, when E. Coke authored the third edition of *Institutes of the Laws of England* ] . . . that municipal corporations and private ones [are] simply two species of 'body politic and corporate,' treated alike in terms of their legal status as persons capable of suing and being sued." *Cook County*, 538 U.S. at 126, 123 S.Ct. 1239. Therefore, public municipal corporations, like private ones, "should be treated as natural persons for virtually all purposes of constitutional and statutory analysis." *Id.* at 126–27, 123 S.Ct. 1239 (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 687–88, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)); (citing W. Glover, *A Practical Treatise on the Law of Municipal Corporations* 41 (1837)) ("[m]unicipal corporations have, as an attribute necessarily and inseparably incident to every corporation, the ability to sue and be sued, . . . and do all other acts as natural persons may") (internal quotations omitted).

■ Consequently, the Court finds the phrase "any . . . corporation" to be unambiguous on its face. Ordinarily, where the text of a Congressional statute is unambiguous, judicial inquiry is complete. *Burlington Northern*, 481 U.S. at 461, 107 S.Ct. 1855; *see also BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183, 124 S.Ct. 1587, 158 L.Ed.2d 338 (2004) ("The preeminent canon of statutory interpretation re-

---

**2.** Congress "intends that the language of this and the other protections provided by [AWPA], be given their plain meaning." H.R.

Rep. 97–885, at 13, *as reprinted in* 1982 U.S.C.C.A.N. 4547, 4559.

quires us to presume that the legislature says in a statute what it means and means in a statute what it says there. Thus, our inquiry begins with the statutory text, and ends there as well if the text is unambiguous.") (internal citation omitted). The Court will nevertheless briefly address the Authority's argument that government entities that are public corporations are such a distinct class that there needs to be explicit evidence of Congressional intent to subject these municipal governmental corporations to liability under a statute which subjects "any corporation" to liability.[3] (Docket No. 57 at 6.)

In the cases the Authority cites for this proposition, however, the courts found substantial evidence, in the statute's legislative history, of Congressional intent to exclude government entities. *See Abbott v. Vill. Of Winthrop Harbor,* 205 F.3d 976, 980 (7th Cir.2000) (substantial evidence that Congress explicitly intended to exclude government entities from those subjected to liability under the statute); *Amati v. City of Woodstock,* 829 F.Supp. 998, 1001 (N.D.Ill.1993) (noting that Congress specifically excluded governmental units from the definition of "person" under the

statute); *In re New York Municipal Securities Litigation,* 507 F.Supp. 169, 181 n. 24 (S.D.N.Y.1980) (holding that the term "corporation" did not include "municipal corporations" because it was "wholly inconsistent with the [statute's] legislative history").

There is no evidence in AWPA's legislative history that government entities were intended to be excluded from the Act's provisions. In fact, in the House Report for AWPA,[4] the Education and Labor Committee stated that it intended AWPA's housing provision, as a whole, to "be interpreted with the broadest possible meaning to ensure that the person who owns or controls the facility used as housing for migrant agricultural workers and their families is responsible for maintaining that facility in compliance with all substantive federal and state safety and health standards." H.R. Rep. 97–885 at 17–18, 1982 U.S.C.C.A.N. at 4563–64. Further, where they have intended certain "persons" to be excluded under this Act, Congress did so explicitly, and the Authority does not fall under any of these exceptions. 29 U.S.C. § 1803(a).[5]

---

**3.** The Authority also contends that the Court should refer to the Dictionary Act's default definition of "person," at 1 U.S.C. § 1, which the Authority argues does not include government entities. (Docket No. 57 at 6–10.) The Court finds referral to the Dictionary Act inapposite here. Because the Court has found that the definition of "person," as defined under AWPA, is unambiguous, there is no need to review a default definition.

**4.** No Senate Report was submitted for the AWPA legislation. H.R. Rep. 97–885, 1982 U.S.C.C.A.N. 4547.

**5.** 29 U.S.C. § 1803(a) states that the following persons are not subject to the AWPA:

(1) Family business exemption. Any individual who engages in a farm labor contracting activity on behalf of a farm, processing establishment, seed conditioning establishment,

cannery, gin, packing shed, or nursery, which is owned or operated exclusively by such individual or an immediate family member of such individual, if such activities are performed only for such operation and exclusively by such individual or an immediate family member, but without regard to whether such individual has incorporated or otherwise organized for business purposes.

(2) Small business exemption. Any person, other than a farm labor contractor, for whom the man-days exemption for agricultural labor provided under section 13(a)(6)(A) of the Fair Labor Standards Act of 1938 (29 U.S.C. § 213(a)(6)(A)) is applicable.

(3) Other exemptions.

(A) Any common carrier which would be a farm labor contractor solely because the carrier is engaged in the farm labor contracting activity of transporting any migrant or seasonal agricultural worker.

As Plaintiffs point out, the only public entities that are excluded under AWPA are public non-profit educational institutions. (Docket No. 50 at 3); *see* 29 U.S.C. § 1803(a)(3)(C). Importantly, nowhere in this list does it exempt government entities such as the Authority.[6] *See* 29 U.S.C. § 1803(a). There is an additional exclusion provided specifically by the housing provision of AWPA into which the Authority also does not fit. That exclusion states that its mandates do "not apply to any person who, in the ordinary course of that person's business, regularly provides housing on a commercial basis to the general public and who provides housing to migrant agricultural workers of the same character and on the same or comparable terms and conditions as is provided to the general public." 29 U.S.C. § 1823(c). This exception applies to persons such as innkeepers, *see* H.R. 97–885 at 29, 1982 U.S.C.C.A.N. at 4574, and thus, also does not encompass entities like the Authority with respect to the farm labor housing they provide to agricultural workers.

■ Accordingly, the Court reiterates that the term "person" under AWPA, as it is defined to mean "any... corporation," is not ambiguous and includes all public corporations except the public corporations explicitly excluded under AWPA. The

(B) Any labor organization, as defined in section 2(5) of the Labor Management Relations Act (29 U.S.C. § 152(5)) (without regard to the exclusion of agricultural employees in that Act [29 U.S.C. § 141–197] or as defined under applicable State labor relations law).

(C) Any nonprofit charitable organization or public or private nonprofit educational institution.

(D) Any person who engages in any farm labor contracting activity solely within a twenty-five mile intrastate radius of such person's permanent place of residence and for not more than thirteen weeks per year.

(E) Any custom combine, hay harvesting, or sheep shearing operation.

(F) Any custom poultry harvesting, breeding, debeaking, desexing, or health service operation provided the employees of the operation are not regularly required to be away from their permanent place of residence other than during their normal working hours.

(G) (i) Any person whose principal occupation or business is not agricultural employment, when supplying full-time students or other individuals whose principal occupation is not agricultural employment to detassel, rogue, or otherwise engage in the production of seed and to engage in related and incidental agricultural employment, unless such full-time students or other individuals are required to be away from their permanent place of residence overnight or there are individuals under eighteen years of age who are providing transportation on behalf of such person.

(ii) Any person to the extent he is supplied with students or other individuals for agricultural employment in accordance with clause (i) of this subparagraph by a person who is exempt under such clause.

(H) (i) Any person whose principal occupation or business is not agricultural employment, when supplying full-time students or other individuals whose principal occupation is not agricultural employment to string or harvest shade grown tobacco and to engage in related and incidental agricultural employment, unless there are individuals under eighteen years of age who are providing transportation on behalf of such person.

(ii) Any person to the extent he is supplied with students or other individuals for agricultural employment in accordance with clause (i) of this subparagraph by a person who is exempt under such clause.

(I) Any employee of any person described in subparagraphs (A) through (H) when performing farm labor contracting activities exclusively for such person.

**6.** In fact, the Supreme Court in *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 188, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978) used the interpretative canon expressio unius est exclusio alterius (the expression of one thing implies the exclusion of another) to conclude that where Congress enumerated a list of exemptions under a statute (there, the Endangered Species Act), that list was exclusive, and that since there was no exemption for federal agencies, Congress did not intend to exempt them.

Court further concludes that AWPA's full text and legislative history, as well as caselaw, are consistent with this finding. Therefore, the Court holds that the Authority, as a public corporation not expressly excluded under AWPA, is subject to liability under AWPA's housing provision.

3. *Whether An Employment Relationship Is Necessary Between The "Person" Who Provides Housing Used by Migrant Farmworkers and the Farmworker under AWPA*

■ Defendant next argues that even if the Authority, as a housing authority, does constitute a "person" under the AWPA, (Docket No. 57 at 10), an employment relationship between it and the migrant workers is necessary before it can become liable under the Act's housing provision. (Docket No. 45 at 6–10). Specifically, the Authority argues that there must be some relationship between their provision of housing to the migrant workers and the terms of the farmworkers' employment. (Docket No. 45 at 7–9.) However, neither the language of the Act nor the caselaw that the Authority cites supports this argument.

In fact, caselaw that both parties to this action cite have refused to constrain liability under AWPA's housing provision to employer-provided housing or to situations where some sort of employment relationship exists between the housing provider and the migrant worker. In refusing to do so, these cases are consistent with both (1) the stated intention of Congress that the housing provision section under AWPA "be interpreted with the broadest possible meaning to ensure that the person who owns or controls the facility used as hous-

ing for migrant agricultural workers and their families is responsible for maintaining that facility in compliance with all substantive federal and state safety and health standards," H.R. Rep. 97–885 at 17–18, 1982 U.S.C.C.A.N. at 4563–64, and (2) caselaw holding that since "AWPA is a remedial statute[,][it] should be construed broadly to effect its humanitarian purpose,"[7] *Caro–Galvan v. Curtis Richardson, Inc.,* 993 F.2d 1500, 1505, 1511 & n. 25 (11th Cir.1993) (restricting its analysis under AWPA to employer-provided migrant worker housing because that situation was before the court, but at the same time, explicitly refusing to address non-employer provided housing situations as that issue was not before the court). *Accord Castillo v. Case Farms of Ohio, Inc.,* 96 F.Supp.2d 578, 613–14 (W.D.Tex.1999) ("unlike most other provisions of the AWPA, the housing provisions hold liable not only 'agricultural employers' and 'farm labor contractors' for violations, but also any person, including private landlords, who owns or controls housing . . . . [T]he housing provisions of the AWPA include landlords in the list of potentially liable entities . . . . [A]ny entity that owns or controls migrant housing can be held liable under the AWPA.") (emphasis added); *Howard v. Malcolm,* 629 F.Supp. 952, 954 (E.D.N.C.1986) (holding a non-employer owner of property liable under AWPA's housing provision, where the non-employer had rented the property to a farm labor contractor, because the property was used as housing for migrant agricultural workers, stating that "Congress obviously intended to apply the AWPA to non-employers when selecting their statutory wording to include 'each person,' not simply 'each agricultural employer' ").

7. Referring to the fact that AWPA was enacted, in large part, to remedy the failure of its predecessor (the Farm Labor Contractor Registration Act of 1963) to protect agricultural workers from exploitation.

Because there is no support for the Authority's argument that the housing provision of AWPA requires an employment relationship between the housing provider and the migrant worker either in the clear language of the statute or under caselaw, the Court therefore finds that the Authority is subject to liability under AWPA's housing provision even though the Authority does not have an employment relationship with Plaintiffs.

### 4. *Plaintiff UFW's Standing*

■ In the Authority's Motion to Dismiss, they also argue that Plaintiff UFW lacks prudential or statutory standing, both as an organization and on behalf of its members, to sue the Authority under either AWPA or the FHA. (Docket No. 45 at 11–17.) In their Response, the UFW argues that it does have standing to sue, both on its own, under principles of organizational standing, and on behalf of its affected members, under principles of associational standing.[8] (Docket No. 50 at 6–11.)

Both AWPA and the FHA vests a person who has been "aggrieved" under the statute with a private cause of action. *See* 29 U.S.C. § 1854(a) (AWPA states that "[a]ny person aggrieved by a violation of this Act or any regulation under this Act by a farm labor contractor, agricultural employer, agricultural association, or other person may file suit in any district court of the United States having jurisdiction of

the parties …"); 42 U.S.C. § 3613(a)(1)(A) (the FHA states that "[a]n aggrieved person may commence a civil action in an appropriate United States district court or State court …"). As an alleged "person aggrieved," the UFW brings a private cause of action in this Court for violations of AWPA and the FHA, and seeks declaratory and injunctive relief from the Court for these alleged violations. (*See* Docket No. 43 ¶ 7.1(c).)

■ Standing is a "threshold question in every federal case, determining the power of the court to entertain the suit." *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). It is a question of whether the plaintiff has made out a "case or controversy" between himself and the defendant within the meaning of Article III to the United States Constitution. *Id.* This Court finds, and both parties concede, that the UFW's standing as an "aggrieved person" under AWPA and the FHA should be analyzed pursuant to the standing requirements under Article III. (Docket Nos. 45 at 11–17, and 50 at 6–11); *See, e.g., Ass'n of Community Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 363–64 (5th Cir.1999) (analyzing the undefined term "party aggrieved," in which the court recognized that "history associates the word aggrieved with a congressional intent to cast the standing net broadly—beyond the common-law interests and substantive statutory rights upon which pru-

---

**8.** For purposes of ruling on a motion to dismiss for lack of standing, the Court must both accept as true all material allegations of the complaint and construe the complaint in favor of the complaining party, but may also consider subsequent discovery, including affidavits submitted by the parties and further particularized allegations of fact deemed supportive of the plaintiff's standing, in order to illuminate the allegations in the complaint and aid the Court in resolving the standing question. *See Warth v. Seldin*, 422 U.S. 490,

501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Spann v. Colonial Village, Inc.*, 899 F.2d 24, 28 n. 1 (D.C.Cir.1990) (citing *Warth*, 422 U.S. at 501, 95 S.Ct. 2197 and *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 95, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979)). Accordingly, this Court considers the affidavit of Rebecca Flores attached to Plaintiffs' response in opposition to the Authority's motion to dismiss for purposes of the standing issue. (Docket No. 50.)

dential standing traditionally rested.") (internal citation omitted).

To establish whether an organization has standing in its own right, the Court conducts the same inquiry as in the case of an individual: "Has the plaintiff alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction?" *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982) (internal citation omitted). For a plaintiff to demonstrate such a personal stake, he must satisfy three elements which comprise the Article III constitutional minimum for establishing standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *Louisiana ACORN Fair Housing v. LeBlanc*, 211 F.3d 298, 304 (5th Cir. 2000).

First, the plaintiff must allege that he has suffered an "injury in fact," an invasion of a legally-protected interest that is (a) concrete and particularized (particularized means that the injury must affect the plaintiff in a personal and individual way), and (b) actual or imminent, not conjectural or hypothetical. *Lujan*, 504 U.S. at 560–61 & n. 1, 112 S.Ct. 2130. Second, there must be a causal connection between the injury and the conduct complained of, meaning that the injury must be fairly traceable to the challenged action of the defendant. *Id.* at 560, 112 S.Ct. 2130. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Id.* at 561, 112 S.Ct. 2130.

With respect to the first two elements, the Supreme Court has held that an organization has suffered an injury in fact caused by a defendant where that organization's ability to provide counseling and referral services has been impaired, and this impairment was caused by the defendant's actions. *Havens*, 455 U.S. at 379, 102 S.Ct. 1114. In *Havens*, the plaintiff was a nonprofit corporation whose purpose was to promote equal opportunity housing in a city in Virginia. *Id.* at 368, 102 S.Ct. 1114. Its activities included the operation of a housing counseling service, and the investigation and referral of complaints concerning housing discrimination. *Id.* at 369, 102 S.Ct. 1114. The plaintiff alleged that its purpose as an organization had been frustrated by the defendant realty corporation's racial steering practices[9] in its efforts to assist equal access to housing through its counseling and other referral services, and that there was an attendant drain on its resources. *Id.* at 369, 379, 102 S.Ct. 1114.

The Supreme Court held that if the plaintiff had in fact been so frustrated in its efforts by the defendant's actions, then "there can be no question that the organization ha[d] suffered [an] injury in fact." *Id.* at 379, 102 S.Ct. 1114. The Supreme Court held that "[s]uch concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitute[d] far more than simply a setback to the organization's abstract social interests." *Id.;* Accord *ACORN Fair Housing*, 211 F.3d at 305 ("an organization could have standing if it had proven a drain on its resources resulting from counteracting the effects of the defendant's actions.") (internal citation omitted).

Similarly, in Plaintiffs' Second Amended Complaint, Plaintiff UFW alleg-

---

9. "Racial steering" refers to segregating people into available housing in different neighborhoods based on the racial or ethnic group to which they belong. *Havens*, 455 U.S. at 366 & n. 1, 102 S.Ct. 1114.

es that it is a nonprofit organization and that many of its farm worker members regularly rely on fair labor housing programs—such as those operated by Defendant Floydada Housing Authority—for housing in Texas. (Docket No. 43 ¶ 3.2.) The UFW's mission is to help farm workers find adequate housing and it "actively and consistently advocate[s] for better treatment of farm workers [with respect to] . . . housing." (Docket No. 50, Flores Aff. ¶ 2.)

The UFW claims, in their Response, that it "has devoted resources and time to try to correct the deficiencies of farm labor housing in Texas" on behalf of its members. (Docket No. 50, Flores Aff. ¶ 3.) These deficiencies include inadequate housing conditions and discriminatory treatment of the farm workers with respect to that housing. (*Id.* at ¶ 3; Docket No. 43 ¶¶ 4.13, 5.8, 5.9.) The UFW claims that the burden of correcting these deficiencies "has prevented UFW from addressing other priorities, including [seeking to improve] poor wages, [and access] to workers compensation and . . . health care for [the] [farm] workers." (Flores Aff. ¶ 3.) Furthermore, the UFW's "inability to improve housing conditions for farm workers in [the Texas Panhandle area, which includes the City of Floydada] has affected the organization's ability to make an impact for [its] members, and [has] harmed the UFW as an organization." *Id.* at ¶ 4. If the UFW's claims prove true—that their organizational goals have been so frustrated and its resources so drained as a result of the Authority's alleged violation of both AWPA and the FHA—then the UFW has suffered an injury in fact its own right sufficient to satisfy the first two elements of constitutional standing.

With respect to the third element, the Court finds that the UFW's injury will be redressed if the Court enjoins the defen-

dant's actions pursuant to the UFW's request for declaratory and injunctive relief. (*See* Docket No. 43 ¶ 7.1(c).) Accordingly, the Court concludes that the UFW has standing to sue the Authority it its own right pursuant to Article III's constitutional standing requirements.

 Under principles of associational standing, "an association has standing to bring suit on behalf of its members when: (1) its members would otherwise have standing to sue in their own right, (2) the interests it seeks to protect are germane to the organization's purpose, and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977).

 With respect to the first element, the UFW can demonstrate that its members have standing to sue in their own right by showing that the three constitutional requirements for standing, noted above, have been met—the members suffered an injury in fact, that injury was caused by the Authority's actions, and granting the requested relief will redress this injury. Plaintiff UFW alleges that some of its members have occupied the Authority's farm labor housing facilities over the years, and are eligible to and intend to reside in these units in the future. (Docket No. 43 ¶ 4.6, Docket No. 50 at 9–10.) The members' injury is both the poor condition of this housing and the discriminatory treatment they received due to the Authority's failure to adhere to AWPA and the FHA. (Docket No. 43 ¶ 4.13, 5.8, 5.9.) This injury will be redressed if the Court enjoins the Authority's actions pursuant to the UFW's request for declaratory and injunctive relief. (*See* Docket No. 43 ¶ 7.1(c).) Accordingly, this Court finds

that the first element of associational standing has been satisfied.

With respect to the second element, the UFW alleges that their organizational "mission is to help farm workers seek improved working conditions, including housing." (Flores Aff. ¶ 3.) Specifically, the UFW alleges that it "actively and consistently advocate[s] for better treatment of farm workers [with respect to] better wages, working conditions and housing." *Id.* at ¶ 2. In fact, they allege that "[a]dvocacy for farm worker[s] [who seek adequate] housing lies at the core of the UFW's organizational purpose." *Id.* at ¶ 3. As noted above, the UFW's members are trying to protect their interest in the adequacy of the Authority's farm labor housing as well as their interest in receiving equal treatment with respect to this housing. The UFW alleges that it seeks to protect these interests and that their advocacy of adequate farm labor housing for farm workers and better treatment for them with respect to such housing lies at the core of their organizational purpose. Therefore, this Court finds that the second element of associational standing is satisfied.

With respect to the third element, the Supreme Court has held that "whether an association has standing to invoke the court's remedial powers on behalf of its members depends in substantial measure on the nature of the relief sought." *Warth v. Seldin*, 422 U.S. 490, 515, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). In *Warth,* the Supreme Court stated that if "the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured." *Id.* In fact, the Supreme Court noted that "in all cases in which we have expressly recognized standing in associa-

tions to represent their members, the relief sought has been of this kind." *Id.* Here, the UFW seeks declaratory and injunctive relief for the Authority's alleged violations of AWPA and the FHA. Therefore, granting this relief will benefit all members of the UFW by redressing their injuries allegedly caused by the Authority. Finally, the UFW is an appropriate representative of its members and is entitled to invoke the court's jurisdiction because the nature of its claims does not make the individual participation of each injured party indispensable to the proper resolution of the case. *Warth,* 422 U.S. at 511, 95 S.Ct. 2197.

## RECOMMENDATION

The Magistrate Court recommends that the District Court DENY the Defendant's motion to dismiss (Docket No. 45).

## WARNINGS

The parties may file objections to this Report and Recommendation. A party filing objections must specifically identify those findings or recommendations to which objections are being made. The District Court need not consider frivolous, conclusive, or general objections. *Battle v. U.S. Parole Comm'n,* 834 F.2d 419, 421 (5th Cir.1987) (quoting *Nettles v. Wainwright,* 677 F.2d 404, 410 n. 8 (5th Cir. 1982) (en banc)).

A party's failure to file written objections to the proposed findings and recommendations contained in this Report within ten (10) days after being served with a copy of the Report shall bar that party from *de novo* review by the District Court of the proposed findings and recommendations and, except upon grounds of plain error, shall bar the party from appellate review of proposed factual findings and legal conclusions accepted by the District Court to which no objections were filed.

*See* 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn,* 474 U.S. 140, 150–53, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Douglass v. United Services Auto. Ass'n,* 79 F.3d 1415, 1428–29 (5th Cir.1996) (en banc).

The Clerk is directed to send a copy of this Report and Recommendation by certified mail, or other verifiable means, to all parties.